1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Richard R. Thomas, Arizona Bar No. 010484
Stephen C. Biggs, Arizona Bar No. 026684
SMITH CAMPBELL CLIFFORD KEARNEY GORE
8777 East Via De Ventura, Suite 315
Scottsdale, Arizona 85258
Telephone:     (480)745-2250
Facsimile:     (480)745-2251
Email:          rthomas@scckg.com
Email:          sbiggs@scckg.com

*Attorneys for Plaintiffs*

Smith | Campbell | Clifford | Kearney | Gore

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

PRESERVE PETRIFIED FOREST LAND INVESTORS, L.L.C, an Arizona limited liability company; C.A.K. LIMITED PARTNERSHIP, a Nevada limited partnership; AMERICAN LAND HOLDINGS, LLC, a Nevada limited liability company,

Plaintiffs,

vs.

RICHARD G. RENZI and ROBERTA RENZI, husband and wife, JAMES W. SANDLIN and TERRY L. RUSSELL, husband and wife,

Defendants.

CASE NO:

**COMPLAINT**

**(Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(a), (c), (d), 1964(c))**

(Jury Trial Demanded)

For their Complaint, Plaintiffs Preserve Petrified Forest Land Investors, LLC; C.A.K. Limited Partnership; and American Land Holdings, LLC, alleges as follows:

## INTRODUCTION

1.     Plaintiffs bring this action to recover the damages they suffered as a result of Defendants' conspiracy and scheme to misuse former Congressman and Defendant Richard Renzi's official authority and influence as a member of the United States House

of Representatives to dupe Plaintiffs into purchasing property owned by Defendants James Sandlin and Terry Russell at a grossly inflated price through a pattern of racketeering activity involving extortion, honest services wire fraud, money laundering, and various monetary transactions involving criminally derived property.

## PARTIES

2.      Plaintiff Preserve Petrified Land Investors, LLC ("Preserve Petrified") is a limited liability company organized under the laws of the state of Arizona.  Preserve Petrified was formed in or about July 2005 for two primary purposes: (1) to acquire the contractual right to purchase various parcels of land in multiple locations in the State of Arizona, including but not limited to environmentally sensitive parcels of land located near the Petrified Forest National Park and lands near San Pedro Riparian National Conservation Area; and (2) to secure the enactment of federal legislation that would permit the exchange of the aforementioned lands for other investment-quality land located in Arizona that was owned or controlled by the Bureau of Land Management.

3.      Plaintiff C.A.K. Limited Partnership ("C.A.K") is a limited partnership formed under the laws of the state of Nevada.  In 2010, C.A.K. became the sole member and manager of Preserve Petrified.

4.      Plaintiff American Land Holdings, LLC ("American Land Holdings"), is a limited liability company formed under the laws of the state of Nevada.  C.A.K. is the managing member of American Land Holdings.

5.      Preserve Petrified, C.A.K., and American Land Holdings have standing to bring these claims.

6.      Defendants Richard G. Renzi ("Renzi") and Roberta Renzi are husband and wife and residents of the state of Arizona.  Richard and Roberta Renzi are herein referred to collectively as "the Renzi Defendants."  At all material times, the Renzi Defendants acted for and on behalf of their marital community.  The Renzi Defendants caused acts or

1    events to occur in Arizona out of which these claims arise.

2        7.    Renzi was a member of the United States House of Representatives for

3    Arizona's First Congressional District (the "House").  Renzi was elected to the House in

4    November of 2002 and was re-elected in 2004 and 2006.  At all times material to this

5    Complaint, Renzi was a member of the House of Representatives Natural Resources

6    Committee.

7        8.    Consistent with his oath of office and the duties of the office he held, Renzi

8    owed the citizens of the United States and the House a duty to perform the responsibilities

9    of his office free from deceit, self-dealing, conflict of interest, and concealment.

10        9.    Defendants James W. Sandlin ("Sandlin") and Terry L. Russell ("Russell")

11    are husband and wife and residents of the state of Texas.  Sandlin and Russell are herein

12    referred to collectively as "the Sandlin Defendants."  At all material times, the Sandlin

13    Defendants acted for and on behalf of their marital community.  The Sandlin Defendants

14    caused acts or events to occur in Arizona out of which these claims arise.

15        10.    Sandlin was a real estate investor, business associate and long-time friend of

16    Renzi.  Sandlin was an active supporter of Renzi's 2002 congressional campaign, and

17    Renzi's business partner as late as 2003.

18        11.    The Sandlin Defendants lived in Sierra Vista, Arizona, from 1995 to

19    September 2001.  The Sandlin Defendants then moved to Kingman, Arizona, where they

20    resided until November 2004.  In November 2004, the Sandlin Defendants moved to

21    Texas where they presently reside.

22                            **JURISDICTION AND VENUE**

23        12.    This Court has personal jurisdiction over the Defendants, inasmuch as each

24    Defendant has caused acts or events to occur in the State of Arizona and this District out

25    of which Plaintiff's claims arise.

26        13.    This Court has subject matter jurisdiction over this action pursuant to 28

Smith | Campbell | Clifford | Kearney | Gore

U.S.C. § 1331, inasmuch as each of Plaintiff's claims arises under 18 U.S.C. § 1964.

14.    Venue is proper in this District under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

I.    **Renzi And Sandlin Owned, Controlled, And Operated Various Business Entities Connected To Their Racketeering Activities.**

A.    **Renzi Investments / Fountain Realty**

15.    From June 26, 1995, to June 26, 2003, Renzi was an owner of Renzi Investments, which was principally engaged in developing real estate in Kingman, Arizona.

16.    From in or around 2001 through in or about June 2003, Renzi and Sandlin were co-owners of Renzi Investments, which was renamed Fountain Realty & Development, Inc. ("Fountain Realty").

17.    In 2003, Sandlin acquired Renzi's remaining interest in Fountain Realty by remitting a cashier's check in the amount of $200,000.00 to Renzi and executing a promissory note in favor of Renzi in the amount of $800,000.00, by which Sandlin promised to pay Renzi that amount in the future.

18.    As of January 1, 2005, Sandlin still owed Renzi $700,000.00 in principal on the $800,000.00 promissory note.

B.    **Renzi & Company / Patriot Insurance Agency**

19.    In or about 2001, Renzi owned and operated Renzi and Company, Inc. ("Renzi & Company"), an insurance agency that engaged in or affected interstate commerce by providing a range of insurance coverage specifically developed for nonprofit organizations.

20.    On or about December 31, 2002, Renzi & Company changed its name to Patriot Insurance Agency, Inc. ("Patriot Insurance"), but continued to serve the same

Smith | Campbell | Clifford | Kearney | Gore

clients as Renzi & Company and thereby continued to engage in or affect interstate commerce.

21.    Patriot Insurance was nominally owned by Roberta Renzi, but Renzi exercised de facto control of Patriot Insurance.  Renzi was the principal leader, organizer, and manager of Patriot Insurance.

22.    Renzi's control of Renzi & Company and Patriot Insurance allowed him to misappropriate insurance premium monies to pay for business expenses, political campaign expenses, and personal expenses.

23.    As alleged below, Renzi enriched himself and others through the misappropriation of insurance premium moneys that were paid to Renzi & Company and Patriot Insurance as fiduciary.  Renzi also used Patriot Insurance as a conduit for illegal proceeds.

24.    At all relevant times, Patriot Insurance (and previously Renzi & Company) was an "enterprise," within the meaning of 18 U.S.C. § 1961(4), which engaged in, or the activities of which affected, interstate commerce.

## II.    Renzi's Membership On The Natural Resources Committee Of The House Of Representatives Placed Him In A Position To Influence Federal Land Exchange Legislation.

25.    As alleged herein, Renzi was elected to the House in November 2002 as the representative for Arizona's First Congressional District.  Renzi was sworn into office in January 2003 and, as a freshman congressman, obtained a seat on the House Natural Resources Committee—the committee responsible for, among other things, approving any land exchange legislation before it can reach the floor of the House of Representatives.

26.    A federal land exchange is a real estate transaction in which a property owner exchanges its privately owned land for federal public land.

27.    Investment groups and private companies interested in executing a federal land exchange customarily acquire options to purchase private real estate parcels of

Smith | Campbell | Clifford | Kearney | Gore

potential interest to the federal government in order to exchange those private parcels with the federal government for federal land.

28.     Investment groups and private companies customarily use options to purchase because of the uncertainty involved in the federal land exchange approval process.  It is unusual for an investment group or private company to make an outright purchase of a parcel of land of potential interest to the federal government for a proposed federal land exchange rather than first acquiring an option to purchase the parcel of land.

29.     Typically, land exchanges are facilitated by government agencies and must comply with three general requirements: the federal parcel and the private land must be appraised to ensure equal value, the exchange must comply with the National Environmental Protection Act, and the exchange must serve the public interest.  Public interest considerations include protection of fish and wildlife habitats, cultural resources, watersheds, and wilderness.

30.     Legislative land exchanges are separate vehicles that avoid all of these requirements.

31.     Because of his membership on the Natural Resources Committee, Renzi was in a position to affect land exchange legislation that came before the House of Representatives.

III.   **Renzi And Sandlin Conspired Together And Engaged In Various Activities Prohibited By The Racketeer Influenced And Corrupt Organizations Act, 18 U.S.C. § 1961 _et seq._**

A.   **Renzi And Sandlin Conspired To Violate 18 U.S.C. § 1962(a) And (c).**

32.     In or about January 2005, Renzi and Sandlin knowingly agreed and conspired to facilitate a scheme that included (a) the operation or management of an association-in-fact enterprise engaged in a pattern of extortion, honest services wire fraud, money laundering, and monetary transactions in criminally derived property; and (b) the use or investment of income or the proceeds of income derived, directly or indirectly,

Smith | Campbell | Clifford | Kearney | Gore

from the pattern of extortion, honest services wire fraud, money laundering, and monetary transactions in criminally derived property in the operation of Patriot Insurance.

33.    The objects of Renzi's and Sandlin's conspiracy included, but were not limited to:

a.    Enriching Renzi and Sandlin by using the promise of Renzi's exercise of his official authority as a member of the House Natural Resources Committee to attempt to compel two different groups interested in executing federal land exchanges to purchase land owned by Sandlin, a portion of the proceeds from which Sandlin could use to repay his outstanding debt to Renzi.

b.    Depriving the public and the House of the intangible right to the honest services of Renzi as a member of the House by providing Renzi with a kickback, in the form of payment of a portion of the sale proceeds, for compelling one of the groups to purchase the land owned by Sandlin as a condition to Renzi's support of the group's legislative land exchange proposal.

c.    Concealing Renzi's financial relationship with Sandlin from the two groups, the House, and the public.

d.    Concealing the payment from Sandlin to Renzi of a substantial portion of the proceeds from the extortionate sale of Sandlin's property because Renzi was having financial difficulty throughout 2005 and needed a substantial infusion of funds to keep Patriot Insurance solvent and to maintain Renzi's personal lifestyle.

34.    To accomplish their conspiracy and scheme, Renzi and Sandlin agreed that Renzi would direct two separate groups interested in acquiring Renzi's support (in his official capacity as a member of the House Natural Resources Committee) for legislative

Smith | Campbell | Clifford | Kearney | Gore

land exchange proposals to purchase real property owned by Sandlin and include that real property in their land exchange proposals as a condition for Renzi's support of the groups' proposals.

35.     Renzi and Sandlin also agreed to conceal from the two groups the fact that Sandlin owed Renzi $700,000.00 in principal on an $800,000.00 promissory note, and that Renzi stood to benefit personally from the sale of Sandlin's real property because Sandlin would be able to use the proceeds from the sale to repay his debt to Renzi.

36.     Renzi and Sandlin further agreed that Sandlin would use a portion of the proceeds from the sale of Sandlin's real property to one of the groups to repay the $700,000.00 in principal that Sandlin owed Renzi on the $800,000.00 promissory note, in order to allow Renzi to infuse needed funds into Patriot Insurance to keep the enterprise solvent as well as to provide Renzi with funds necessary to support his lavish personal lifestyle.

37.     Renzi and Sandlin further agreed to use or cause to be used wire communications in interstate commerce—including but not limited to interstate telephone calls, interstate wire transfers, and interstate faxes—to facilitate and carry out this honest services fraud scheme.

38.     Renzi and Sandlin further agreed to conceal the payment from Sandlin to Renzi of a portion of the illegal proceeds derived from their extortion and honest services wire fraud by, among other things, laundering the proceeds through one or more intermediaries, including Renzi Vino, Inc. (an Arizona company owned by Renzi) and Patriot Insurance, in various monetary and financial transactions.

39.     If successful, the scheme Renzi and Sandlin conspired to facilitate would result in violations of 18 U.S.C. § 1962(a) and (c).

**B.     Renzi And Sandlin Formed An Association-In-Fact Enterprise.**

40.     Beginning no later than January 2005 and continuing until at least October

8

Smith | Campbell | Clifford | Kearney | Gore

2006, Renzi and Sandlin associated together for the common purpose of carrying out their conspiracy and scheme to commit extortion and honest services fraud through the pattern of racketeering acts and other wrongful conduct alleged herein.

41.    In carrying out their scheme, Renzi and Sandlin functioned as a continuing unit to achieve several common objectives, including but not limited to:

a.    Enriching Renzi and Sandlin by using the promise of Renzi's exercise of his official authority as a member of the House Natural Resources Committee to attempt to compel two different groups interested in executing federal land exchanges to purchase land owned by Sandlin, a portion of the proceeds from which Sandlin could use to repay his outstanding debt to Renzi.

b.    Depriving the public and the House of the intangible right to the honest services of Renzi as a member of the House by providing Renzi with a kickback, in the form of payment of a portion of the sale proceeds, for compelling one of the groups to purchase the land owned by Sandlin as a condition to Renzi's support of the group's legislative land exchange proposal.

c.    Concealing Renzi's financial relationship with Sandlin from the two groups, the House, and the public.

d.    Concealing the payment from Sandlin to Renzi of a substantial portion of the proceeds from the extortionate sale of Sandlin's property because Renzi was having financial difficulty throughout 2005 and needed a substantial infusion of funds to keep Patriot Insurance solvent and to maintain Renzi's personal lifestyle.

42.    Renzi and Sandlin worked together and in tandem as an informal organization to achieve these objectives through their pattern of racketeering activity and

Smith | Campbell | Clifford | Kearney | Gore

their other wrongful conduct alleged herein.

43.     Renzi's and Sandlin's association was of sufficient longevity to permit Renzi and Sandlin to engage in the pattern of racketeering activity and other wrongful conduct alleged herein and to accomplish their common objectives.

44.     Renzi and Sandlin constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), in that they constituted a union or group of individuals associated in fact although not a legal entity.  That enterprise shall be referred to hereinafter as "the Renzi & Sandlin Enterprise."

**C.**     **Renzi And Sandlin Conducted The Renzi & Sandlin Enterprise Through A Pattern Of Extortion, Honest Services Wire Fraud, Money Laundering, And Monetary Transactions In Criminally Derived Property, In Violation Of 18 U.S.C. § 1962(c).**

**1.**     **Renzi and Sandlin Devised and Attempted to Execute a Scheme to Extort Resolution Copper Mining, LLC, and Deprive the Public and the House of the Intangible Right to the Honest Services of Renzi.**

45.     In 2004 and 2005, Resolution Copper Mining, LLC ("Resolution Copper") owned the mineral rights to a large copper deposit located near Superior, Arizona (the "Superior Property"), within Renzi's congressional district.   The United States government owned the surface rights to the Superior Property.

46.     Resolution Copper was preparing to extract the copper from the Superior Property, but wanted first to secure ownership of the surface rights to the Superior Property from the United States government through a federal land exchange.

47.     In order to obtain the surface rights to the Superior Property via a land exchange with the federal government, Resolution Copper hired Western Land Group, a consulting firm, to assist Resolution Copper in acquiring private property that would be attractive to the federal government, and which Resolution Copper could offer to the federal government in exchange for the surface rights to the Superior Property.

48.     The proposed federal land exchange that Resolution Copper hoped to

COMPLAINT

accomplish with the federal government was a legislative land exchange that would need to be approved by the House Natural Resources Committee before it could be voted on in the full House.

49.     Renzi's support for the proposed land exchange was essential because of his position on the Natural Resources Committee.

50.     In 2005, Western Land Group approached Renzi about developing and sponsoring the necessary land exchange legislation, a proposed bill which would eventually be known as the Southeast Arizona Land Exchange and Conservation Act.

51.     Renzi began meeting with representatives of Resolution Copper in January 2005 to discuss the proposed land exchange and Renzi's proposed sponsorship of the necessary land exchange legislation.

52.     At a meeting on or about January 11, 2005, in the District of Arizona, Renzi did not disclose to Resolution Copper and Western Land Group, and Resolution Copper and Western Land Group did not know, that Sandlin owed Renzi $700,000.00 in principal on an $800,000.00 promissory note.

53.     In February 2005, Renzi met in his congressional office with representatives of Resolution Copper and Western Land Group and instructed Resolution Copper to purchase a section of property owned by the Sandlin Defendants in Cochise County, Arizona ("the Sandlin Property"), to be included in the proposed federal land exchange for the surface rights to the Superior Property.  Renzi insisted that the Sandlin Property be included in Resolution Copper's land exchange proposal if Renzi was to be a sponsor, representing to Resolution Copper that the acquisition of the Sandlin Property was important to limit water use in the area near Fort Huachuca.

54.     During the February 2005 meeting, Renzi did not disclose, nor did he ever disclose, to Resolution Copper or Western Land Group that Sandlin owed Renzi $700,000.00 in principal on an $800,000.00 note even though a member of Western Land

COMPLAINT

Group expressly asked Renzi about any business relationship with Sandlin.

55.     During the February 2005 meeting, Renzi also did not disclose, nor did he ever disclose, to Resolution Copper or Western Land Group that Sandlin had agreed to pay Renzi a portion of the proceeds from the sale of the Sandlin Property in exchange for Renzi's insistence that Resolution Copper purchase the property and include it in Resolution Copper's land exchange proposal.

56.     In or about March 2005, knowing that Renzi had directed Resolution Copper to purchase the Sandlin Property as a condition of his support for Resolution Copper's land exchange proposal and in an attempt to extract more money from Resolution Copper, Sandlin rejected reasonable requests and terms in relation to the sale of the Sandlin Property, thereby causing Resolution Copper to advise Renzi that Resolution Copper was unlikely to be able to reach an agreement with Sandlin for the purchase of the Sandlin Property.

57.     On March 18, 2005, Renzi spoke by telephone in an interstate phone call with a representative of Resolution Copper in Arizona, stating (in substance) that Sandlin would be more cooperative in future discussions and urging the representative to conclude successful negotiations with Sandlin.

58.     On or about March 18, 2005, shortly after the interstate phone conversation between Renzi and the Resolution Copper representative, Sandlin transmitted a letter via fax from Texas to Resolution Copper's Arizona offices in which he stated: "I just received a phone call from Congressman Renzi's office.  They have the impression that I haven't been cooperative concerning this water issue.  I feel I have been very cooperative. . . . I still want to cooperate."

59.     In the March 18 letter, Sandlin did not disclose, nor did he ever disclose, to Resolution Copper or Western Land Group that Sandlin owed Renzi $700,000.00 in principal on an $800,000.00 note or that Sandlin had agreed to pay Renzi a portion of the

Smith | Campbell | Clifford | Kearney | Gore

proceeds from the sale of the Sandlin Property.

60.     On or about April 12, 2005, after the vice president and general manager of Resolution Copper informed Renzi that Resolution Copper would not acquire the Sandlin Property from Sandlin because they had not been able to reach a financial agreement, Renzi replied: "[N]o Sandlin Property, no bill," meaning that Renzi would not sponsor Resolution Copper's legislative land exchange proposal unless Resolution Copper purchased the Sandlin Property and included it in the land exchange.

61.     Resolution Copper thereafter ended its negotiations with Sandlin.

62.     Renzi's threat to kill Resolution Copper's proposed land exchange unless Resolution Copper purchased the Sandlin Property was motivated solely by Renzi's desire to derive a personal profit from the sale of the Sandlin Property, was not motivated by a desire to benefit the federal government or the public in general, and entirely disregarded the intangible right of both the public and the House to the honest services of Renzi as a member of the House.

63.     Renzi's and Sandlin's attempt and conspiracy to obtain from Resolution Copper, with Resolution Copper's consent, money to which Renzi and Sandlin were not entitled by inducing Resolution Copper, under the color of official right, to purchase the Sandlin Property using the promise of Renzi's exercise of his official authority as a member of the House and House Natural Resources Committee to take official action to assist Resolution Copper, and the threat that Renzi would withhold official action and thereby disrupt the business of Resolution Copper if Resolution Copper did not comply, constituted extortion under the Hobbs Act, in violation of 18 U.S.C. § 1951(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

64.     Each of Renzi's and Sandlin's interstate wire transmissions (including the interstate telephone calls and fax transmissions alleged herein), and the interstate wire transmissions they caused others to send, in furtherance of their scheme and artifice to

Smith | Campbell | Clifford | Kearney | Gore

13

COMPLAINT

deprive the public and the House of the intangible right to the honest services of Renzi as a member of the House through the attempted extortion of Resolution Copper, constituted an act of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

> **2.   Renzi and Sandlin Devised and Executed a Scheme to Extort Plaintiffs and Deprive the Public and the House of the Intangible Right to the Honest Services of Renzi.**

65.   On December 3, 2004, President George W. Bush signed the Petrified Forest National Expansion Act of 2004 (the "Expansion Act"), which expanded the boundaries of the Petrified Forest National Park in northern Arizona and authorized the Secretary of the Interior to acquire private and state lands within the Park's revised boundary to be administered as part of the Park.  However, the Expansion Act did not provide for any additional funds to acquire property for the expansion.

66.   Thereafter, the Aries Group acquired options on approximately 15,000 acres of land within the revised boundary of the Petrified Forest National Park, intending to trade the land with the federal government through a legislative land exchange for property owned by the federal government that was ripe for development.

> **a.   Renzi and Sandlin Extorted the Aries Group and American Land Holdings into Agreeing to Purchase the Sandlin Property without Disclosing the Kickback Renzi would Receive from Sandlin.**

67.   On or about April 16, 2005, Renzi met in the District of Arizona with the Aries Group to discuss the possibility of Renzi sponsoring a legislative land exchange on the Aries Group's behalf.

68.   During the April 16, 2005, meeting between Renzi and the Aries Group, Renzi insisted the Aries Group purchase the Sandlin Property and include that property as part of the group's land exchange proposal.  Renzi represented to the Aries Group that the Sandlin Property was environmentally sensitive and should be federally owned.  Renzi

Smith | Campbell | Clifford | Kearney | Gore

COMPLAINT

told the Aries Group their land exchange proposal would receive a "free pass" through the Natural Resources Committee if they purchased the Sandlin Property and included it in their proposal.

69. During the April 16, 2005, meeting, Renzi did not disclose, nor did he ever disclose to the Aries Group and the Aries Group did not know, that Sandlin owed Renzi $700,000.00 in principal on an $800,000.00 promissory note.

70. During the April 16, 2005, meeting, Renzi did not disclose, nor did he ever disclose to the Aries Group and the Aries Group did not know, that Sandlin had agreed to pay Renzi a portion of the proceeds from the sale of the Sandlin Property in exchange for Renzi's insistence that the Aries Group purchase the property and include it in the Aries Group's land exchange proposal.

71. On or about April 17, 2005, as a result of the meeting between Renzi and the Aries Group, a representative of the Aries Group sent the following interstate wire communication by means of email to Renzi's congressional office:

> I have the funds committed for the purchase of the Sandlin Conservation Easement. We now can fund on 3 days [sic] notice. Please let me know how to proceed with you and [a non-profit group]. Please be sensitive to the fact that we are going way out on a limb at the request of Congressman Renzi. I am putting my complete faith in Congressman Renzi and you that this is the correct decision. I stand waiting for your instructions.

72. In April 2005, knowing that Renzi had mandated the purchase of the Sandlin Property as a condition to his support of the Aries Group's proposed land exchange, Sandlin rejected the Aries Group's request for an option to purchase the property. Instead, Sandlin artificially inflated the sales price for the property, thereby causing the Aries Group (through American Land Holdings) to agree to purchase 480 acres of the Sandlin Property from Sandlin and Russell for $4,500,000.00—a price well above the market value of the Sandlin Property.

73. During Sandlin's April 2005 contact with the Aries Group, Sandlin did not

disclose, nor did he ever disclose, and the Aries Group did not know, that Sandlin owed Renzi $700,000.00 in principal on an $800,000.00 note or that Sandlin had agreed to pay Renzi a portion of the proceeds from the sale of the Sandlin Property.

74.    In ignorance of the fact that Sandlin owed Renzi $700,000.00 and that Sandlin had agreed to pay a portion of the proceeds from the sale of the Sandlin Property to Renzi, the Aries Group caused American Land Holdings to execute a Vacant Land/Lot Purchase Contract ("Purchase Contract") on May 5, 2005, whereby American Land Holdings agreed to purchase 480 acres of the Sandlin Property for $4,500,000.00—with $1,000,000.00 to be paid immediately to Sandlin as earnest money and the remaining $3,500,000.00 to be paid at the close of escrow.

75.    But for Renzi's insistence that Plaintiffs purchase the Sandlin Property as a condition to his support for the Aries Group's proposed land exchange, American Land Holdings would not have executed the Purchase Contract or otherwise agreed to purchase the Sandlin Property.

          **b.**    **<u>Renzi and Sandlin Used Multiple Additional Wire Transmissions and Various Monetary and Financial Transactions to Complete Their Scheme and Conceal the Illegal Kickback Paid to Renzi.</u>**

76.    The parties to the Purchase Contract engaged Fidelity National Title Agency ("Fidelity") to close the Purchase Contract.  Fidelity designated its employee Lynne Skelton as the escrow officer and opened an escrow account for the transaction.

77.    Fidelity is a financial institution engaged in, or the activities of which affect, interstate or foreign commerce.  Fidelity is involved in real estate closings and settlings and is part of one of the largest title and escrow companies in the United States.

78.    As part of the execution of the Purchase Contract, Sandlin caused the Aries Group, through American Land Holdings, to make two interstate wire transfers of funds totaling $1,000,000.00, which funds were eventually deposited in Sandlin's and Russell's

Smith | Campbell | Clifford | Kearney | Gore

bank account at Stockmen's Bank in Kingman, Arizona.  These wire transfers were as follows:

    a.    On May 3, 2005, American Land Holdings wire transferred $500,000.00 from Henderson, Nevada, to Tucson, Arizona.

    b.    On May 5, 2005, American Land Holdings wire transferred an additional $500,000.00 from Henderson, Nevada, to Tucson, Arizona.

79.    Each of these wire transfers constituted an act of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, and an act of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin were culpable as principals within the meaning of 18 U.S.C. § 2.

80.    On or about May 5, 2005, Sandlin wrote a check drawn on his and Russell's account at Stockmen's Bank in the amount of $200,000.00 payable to Renzi Vino, Inc. ("Renzi Vino"), an Arizona corporation owned by Renzi.

81.    Stockmen's Bank is a financial institution engaged in, or the activities of which affect, interstate or foreign commerce.

82.    Sandlin knew the funds upon which he was drawing from his and Russell's account at Stockmen's Bank to write the $200,000.00 check represented the proceeds of Renzi's and Sandlin's unlawful activity.

83.    The funds upon which Sandlin drew to write the $200,000.00 check did in fact involve the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

84.    Sandlin also knew that the financial transaction he was conducting when he wrote the $200,000.00 check was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

Smith | Campbell | Clifford | Kearney | Gore

85.     Sandlin's conduct in engaging in the financial transaction by which he wrote the $200,000.00 check to Renzi Vino constituted an act of both money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

86.     On or about May 20, 2005, Renzi deposited the $200,000.00 check drawn on Sandlin's and Russell's account at Stockmen's Bank and made payable to Renzi Vino into Patriot Insurance's trust account at Bank One, N.A. ("Bank One").

87.     Bank One was a financial institution engaged in, or the activities of which affected, interstate or foreign commerce.  Bank One was the sixth-largest bank in the United States before it was acquired by JP Morgan Chase & Co. in 2004.

88.     Renzi knew when he deposited the $200,000.00 check into Patriot Insurance's trust account that the $200,000.00 in funds he was depositing represented the proceeds of Renzi's and Sandlin's unlawful activity.

89.     The funds Renzi deposited into Patriot Insurance's trust account did in fact involve the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

90.     Renzi knew the financial transaction he was conducting when he deposited the $200,000.00 check into Patriot Insurance's trust account was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

91.     Renzi's conduct in engaging in the financial transaction by which he deposited the $200,000.00 check to Renzi Vino in Patriot Insurance's trust account constituted an act of both money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in criminally derived property, in violation of 18

U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

92.   On or about May 12, 2005, Sandlin purchased a cashier's check from a financial institution payable to The Slalom Shop, which Sandlin used to purchase a boat.

93.   Upon information and belief, Sandlin knew the funds he used to purchase the cashier's check represented the proceeds of Renzi's and Sandlin's unlawful activity.

94.   The funds Sandlin used to purchase the cashier's check did in fact involve the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

95.   Sandlin's conduct in purchasing the cashier's check and using it to purchase a boat constituted an act of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

96.   On or about July 6, 2005, Sandlin sent from Texas to Arizona an interstate wire communication via fax containing both a signed addendum extending escrow and wire deposit instructions for an extension-of-escrow fee to be paid by the Aries Group (through American Land Holdings) to extend escrow on the transaction for the purchase of the Sandlin Property.

97.   Sandlin sent the interstate fax in furtherance of Renzi's and Sandlin's scheme and artifice to deprive the public and the House of the intangible right to the honest services of Renzi as a member of the House through the extortion of Plaintiffs. The sending of the interstate fax constituted an act of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

98.   Also on or about July 6, 2005, Sandlin caused the Aries Group (through American Land Holdings) to make an interstate wire transfer from Henderson, Nevada, to

Smith | Campbell | Clifford | Kearney | Gore

Tucson, Arizona, in the amount of $264,653.39 as an additional payment into escrow toward the purchase of the Sandlin Property.

99. Sandlin caused the Aries Group (through American Land Holdings) to make the interstate wire transfer in furtherance of Renzi's and Sandlin's scheme and artifice to deprive the public and the House of the intangible right to the honest services of Renzi as a member of the House through the extortion of Plaintiffs.

100. The funds transferred by the Aries Group involved the proceeds of specified unlawful activity—namely the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein—and Sandlin knew the funds represented the proceeds of Renzi's and Sandlin's unlawful activity.

101. Sandlin knew the financial transaction by which the Aries Group wire transferred the additional payment into escrow was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

102. Sandlin's involvement in the financial transaction by which the Aries Group wire transferred the additional payment into escrow constituted an act of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; an act of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and an act of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin were culpable as principals within the meaning of 18 U.S.C. § 2.

103. On or about July 7, 2005, Sandlin caused Fidelity to wire transfer funds in the amount of $100,000.00 from the escrow account to Sandlin's and Russell's bank account at Stockmen's Bank as payment for the extension of escrow.

104. Sandlin knew the funds he caused Fidelity to transfer from the escrow account to his and Russell's bank account at Stockmen's Bank represented the proceeds of

Smith | Campbell | Clifford | Kearney | Gore

Renzi's and Sandlin's unlawful activity.

105.    The funds Sandlin caused Fidelity to transfer from the escrow account to his and Russell's bank account at Stockmen's Bank did in fact involve the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

106.    Sandlin's conduct in engaging in the financial transaction by which he caused Fidelity to transfer $100,000.00 in funds from the escrow account to his and Russell's bank account at Stockmen's Bank constituted an act of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

107.    In or about September 2005, prior to closing on the Sandlin Property, the Aries Group sought and received assurances from Renzi that the Sandlin Property was an important part of the Aries Group's legislative land exchange proposal and that Renzi would in fact introduce the Aries Group's legislative land exchange proposal.

108.    Upon information and belief, on or about September 26, 2005, Sandlin and Renzi caused $445,000.00 in funds to be transferred by interstate wire transfer from New York to Arizona by means of a transaction conducted through or at Pioneer Title Agency ("Pioneer Title") in Sierra Vista, Arizona, in furtherance of Renzi's and Sandlin's scheme and artifice to deprive the public and the House of the intangible right to the honest services of Renzi as a member of the House through the extortion of Plaintiffs.

109.    Upon information and belief, also on or about September 26, 2005, Sandlin and Renzi caused an additional $551,000.00 in funds to be transferred by a separate interstate wire transfer from New York to Arizona by means of a transaction conducted through or at Pioneer Title in Sierra Vista, Arizona, in furtherance of Renzi's and Sandlin's scheme and artifice to deprive the public and the House of the intangible right to the honest services of Renzi as a member of the House through the extortion of Plaintiffs

110.   Pioneer Title is a financial institution engaged in, or the activities of which affect, interstate or foreign commerce.

111.   Each of the September 26, 2005, wire transfers alleged above constituted an act of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

112.   Upon information and belief, on or about September 27, 2005, Renzi and Sandlin caused an interstate wire transfer to be sent from Texas to Arizona containing payout instructions for the payment of $533,000.00 from Sandlin to Patriot Insurance in furtherance of Renzi's and Sandlin's scheme and artifice to deprive the public and the House of the intangible right to the honest services of Renzi as a member of the House through the extortion of Plaintiffs.

113.   The September 27, 2005, wire transfer constituted an act of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, for which both Renzi and Sandlin were culpable as principals within the meaning of 18 U.S.C. § 2.

114.   On or about September 30, 2005, Renzi caused a Patriot Insurance letter, which was addressed to Sandlin and dated August 30, 2005, to be faxed to Pioneer Title in Sierra Vista, Arizona, that falsely stated in part:

> This letter is informing you of Mr. Renzi 'calling' in the note for the Kingman property.  It is his understanding you have recently sold this land, therefore the balance of the note plus interest, is due and payable.  Patriot Insurance Agency, Inc. is handling this part of the former Renzi Investments.

115.   The statements in the letter regarding the sale of the Kingman property and the "calling" of the note were false and both Renzi and Sandlin knew or should have known the statements were false.  The purpose of the letter was to hide the source and nature of the money Sandlin had agreed to pay Renzi in furtherance of Renzi's and Sandlin's scheme and artifice to deprive the public and the House of the intangible right to the honest services of Renzi as a member of the House through the extortion of Plaintiffs.

116.   On or about September 30, 2005, Sandlin paid $533,000.00 to Patriot Insurance through a transaction conducted by Sandlin at Pioneer Title in Sierra Vista, Arizona.

117.   Sandlin knew the funds upon which he was drawing to pay the $533,000.00 to Patriot Insurance represented the proceeds of Renzi's and Sandlin's unlawful activity.

118.   The funds upon which Sandlin drew to pay the $533,000.00 to Patriot Insurance did in fact involve the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

119.   Sandlin also knew that the financial transaction he was conducting when he paid the $533,000.00 to Patriot Insurance was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

120.   Sandlin's conduct in engaging in the financial transaction by which paid the $533,000.00 to Patriot Insurance constituted an act of both money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

121.   Upon information and belief, on or about September 30, 2005, Renzi deposited the $533,000.00 paid to Patriot Insurance by Sandlin into Patriot Insurance's bank account at Bank One.

122.   Renzi knew the funds he was depositing in Patriot Insurance's bank account represented the proceeds of Renzi's and Sandlin's unlawful activity.

123.   The funds Renzi deposited in Patriot Insurance's bank account at Bank One did in fact involve the proceeds of specified unlawful activity—namely, the acts of

extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

124.   Renzi also knew that the financial transaction he was conducting when he deposited the funds in Patriot Insurance's bank account was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

125.   Renzi's conduct in engaging in the financial transaction by which deposited the funds in Patriot Insurance's bank account constituted an act of both money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

126.   On or about September 30, 2005, Renzi opened a bank account at Bank One in the name of "Rick Renzi Rain Whisper Account" ("Rain Whisper Account") using the Patriot Insurance employer identification number.

127.   On or about September 30, 2005, Renzi caused the $533,000.00 in funds paid to Patriot Insurance by Renzi in furtherance of Renzi's and Sandlin's scheme and artifice to deprive the public and the House of the intangible right to the honest services of Renzi as a member of the House through the extortion of Plaintiffs to be wire transferred by an intra-bank transfer from Patriot Insurance's bank account at Bank One to the Rain Whisper Account at Bank One.

128.   Renzi knew the funds he was transferring to the Rain Whisper Account represented the proceeds of Renzi's and Sandlin's unlawful activity.

129.   The funds Renzi transferred to the Rain Whisper Account did in fact involve the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

130.   Renzi also knew that the financial transaction he was conducting when he

Smith | Campbell | Clifford | Kearney | Gore

transferred the funds to the Rain Whisper Account was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

131. Renzi's conduct in engaging in the financial transaction by which he transferred the funds to the Rain Whisper Account constituted an act of both money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

132. The sale of the Sandlin Property closed on October 7, 2005.

133. Prior to the close of the sale of the Sandlin Property, on or about October 7, 2005, American Land Holdings assigned all of its right, title, and interest in, to, and under the Purchase Contract to Preserve Petrified. Sandlin and Russell consented in writing to the assignment.

134. Preserve Petrified would not have accepted the assignment of American Land Holdings' right, title, and interest in, to, and under the Purchase Contract and proceeded to close the sale of the Sandlin Property under the Purchase Contract but for Renzi's insistence that he would not support the Aries Group's land exchange proposal unless Preserve Petrified purchased the Sandlin Property.

135. As part of the close of the sale of the Sandlin Property under the Purchase Contract, on or about October 7, 2005, Sandlin caused Preserved Petrified to transfer approximately $1,600,000.00 to Sandlin and Russell through the escrow account established by Fidelity for the sale of the Sandlin Property. Part of this payment was accomplished through an interstate wire transfer of $827,413.03 from a financial institution in Las Vegas, Nevada, to a financial institution in Tucson, Arizona.

136. Sandlin caused Preserve Petrified to make the October 7, 2005, interstate

wire transfer in furtherance of Renzi's and Sandlin's scheme and artifice to deprive the public and the House of the intangible right to the honest services of Renzi as a member of the House through the extortion of Plaintiffs.

137.   The October 7, 2005, wire transfer alleged above constituted an act of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, for which both Renzi and Sandlin were culpable as principals within the meaning of 18 U.S.C. § 2.

138.   Based on Renzi's and Sandlin's representations, C.A.K. invested over $1,500,000.00 in Preserve Petrified to fund Preserve Petrified's approximately $1,600,000.00 payment to Sandlin and Russell.

139.   Also as part of the close of the sale of the Sandlin Property under the Purchase Contract, Preserve Petrified executed a promissory note in favor of Sandlin and Russell on October 7, 2005, in the amount of $2,000,000.00.   The promissory note was secured by a second priority deed of trust for the Sandlin Property that Preserve Petrified granted to Sandlin and Russell.

140.   Preserve Petrified would not have executed the promissory note in favor of or granted the deed of trust to Sandlin and Russell but for Renzi's insistence that he would not support the Aries Group's land exchange proposal unless the Aries Group purchased the Sandlin Property and included that property in the land exchange proposal.

141.   Renzi and Sandlin knew the approximately $1,600,000.00 in funds Preserve Petrified transferred to Sandlin and Russell through escrow to close the sale of the Sandlin Property, as well as the $2,000,000.00 promissory note Preserve Petrified executed in favor of Sandlin and Russell, represented the proceeds of Renzi's and Sandlin's unlawful activity.

142.   The approximately $1,600,000.00 in funds Preserve Petrified transferred to Sandlin and Russell through escrow to close the sale of the Sandlin Property, as well as the $2,000,000.00 promissory note Preserve Petrified executed in favor of Sandlin and

Smith | Campbell | Clifford | Kearney | Gore

Russell, did in fact involve the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

143.   Sandlin's conduct in engaging in the financial transaction by which Preserve Petrified transferred the approximately $1,600,000.00 in funds to Sandlin and Russell through escrow and executed the $2,000,000.00 promissory note in favor of Sandlin and Russell to close the sale of the Sandlin Property constituted an act of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

144.   On or about October 7, 2005, Sandlin caused Fidelity to wire transfer escrow funds in the amount of $1,549,104.92 from a financial institution in Tucson, Arizona, to a financial institution in McKinney, Texas, as Sandlin's and Russell's seller proceeds from the sale of the Sandlin Property.

145.   Sandlin caused Fidelity to make the October 7, 2005, wire transfer in furtherance of Renzi's and Sandlin's scheme and artifice to deprive the public and the House of the intangible right to the honest services of Renzi as a member of the House through the extortion of Plaintiffs.

146.   The October 7, 2005, wire transfer alleged above constituted an act of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, for which both Renzi and Sandlin were culpable as principals within the meaning of 18 U.S.C. § 2.

147.   Sandlin knew the $1,549,104.92 in seller proceeds wire transferred from the escrow account by Fidelity represented the proceeds of Renzi's and Sandlin's unlawful activity.

148.   The $1,549,104.92 in seller proceeds wire transferred from the escrow account by Fidelity did in fact involve the proceeds of specified unlawful activity—

Smith | Campbell | Clifford | Kearney | Gore

namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

149.    Sandlin's conduct in causing Fidelity to wire transfer the $1,549,04.92 in seller proceeds from the escrow account constituted an act of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

150.    As alleged herein, by the close of the sale of the Sandlin Property, Plaintiffs had paid Sandlin and Russell a total of approximately $2,600,000.00 and, in addition, executed a promissory note in favor of Sandlin and Russell in the amount of $2,000,000.00 as consideration for the Sandlin Property.  This consideration constituted an amount well in excess of the fair market value of the Sandlin Property and Plaintiffs would not have paid this consideration or purchased the Sandlin Property but for the wrongful conduct of Renzi and Sandlin alleged herein.

151.    As alleged herein, as a result of the sale of the Sandlin Property to Plaintiffs, Sandlin paid Renzi a total of $733,000.00 during the course of 2005 as an illegal kickback for Renzi's role in the scheme to extort Plaintiffs by mandating that Plaintiffs purchase the Sandlin Property and include it in their land exchange proposal as a condition to Renzi supporting that land exchange proposal.

152.    As alleged herein, Renzi and Sandlin used various financial and monetary transactions to enrich themselves and entities they controlled and to conceal from Plaintiffs, Congress, and the public Renzi's receipt of the $733,000.00 illegal kickback.

   **3.    Following the Sale of the Sandlin Property, Renzi and Sandlin Continued to Engage in Various Monetary and Financial Transactions Involving the Proceeds from their Extortion and Honest Services Wire Fraud in a Continued Effort to Conceal their Wrongful Conduct and Profit Therefrom.**

153.    Between October 11, 2005, and January 5, 2006, Renzi transferred $200,000.00 from the Rain Whisper Account to Renzi's personal checking account to pay

Smith | Campbell | Clifford | Kearney | Gore

for Renzi's personal expenses.  The individual transfers, which constituted nine separate transactions, were as follows:

154.    On October 11, 2005, Renzi transferred $50,000.00 from the Rain Whisper Account to Renzi's personal checking account via an intra-bank transfer within Bank One.

155.    On November 10, 2005, Renzi transferred $20,000.00 from the Rain Whisper Account to Renzi's personal checking account via an intra-bank transfer within Bank One.

156.    On November 22, 2005, Renzi transferred $20,000.00 from the Rain Whisper Account to Renzi's personal checking account via an intra-bank transfer within Bank One.

157.    On November 29, 2005, Renzi transferred $20,000.00 from the Rain Whisper Account to Renzi's personal checking account via an intra-bank transfer within Bank One.

158.    On December 8, 2005, Renzi transferred $45,000.00 from the Rain Whisper Account to Renzi's personal checking account via an intra-bank transfer within Bank One.

159.    On December 15, 2005, Renzi transferred $10,000.00 from the Rain Whisper Account to Renzi's personal checking account via an intra-bank transfer within Bank One.

160.    On December 19, 2005, Renzi transferred $15,000.00 from the Rain Whisper Account to Renzi's personal checking account via an intra-bank transfer within Bank One.

161.    On January 3, 2006, Renzi transferred $10,000.00 from the Rain Whisper Account to Renzi's personal checking account via an intra-bank transfer within Bank One.

162.    On January 5, 2006, Renzi transferred $10,000.00 from the Rain Whisper Account to Renzi's personal checking account via an intra-bank transfer within Bank One.

163.    Each of the above-alleged transactions by which Renzi transferred funds

from the Rain Whisper Account to Renzi's personal checking account involved the proceeds of specified unlawful activity—namely the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein—and Renzi knew or should have known the funds represented the proceeds of Renzi's and Sandlin's unlawful activity.

164.   Renzi knew each of the above-alleged transactions by which Renzi transferred funds from the Rain Whisper Account to Renzi's personal checking account was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

165.   Each of the above-alleged transactions by which Renzi transferred funds from the Rain Whisper Account to Renzi's personal checking account constituted an act of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and an act of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin were culpable as principals within the meaning of 18 U.S.C. § 2.

166.   On or about November 18, 2005, Sandlin wrote a check in the amount of $242,250.00 on an account at Independent Bank to pay off a separate personal debt owed by Renzi.

167.   Independent Bank is a financial institution engaged in, or the activities of which affect, interstate or foreign commerce.

168.   Upon information and belief, Sandlin knew the funds upon which he was drawing from the account at Independent Bank to write the $242,250.00 check represented the proceeds of Renzi's and Sandlin's unlawful activity.

169.   Upon information and belief, the funds upon which Sandlin drew to write the $242,250.00 check did in fact involve the proceeds of specified unlawful activity—

namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

170.   Upon information and belief, Sandlin also knew that the financial transaction he was conducting when he wrote the $242,250.00 check was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

171.   Sandlin's conduct in engaging in the financial transaction by which he wrote the $242,250.00 check to pay off Renzi's separate personal debt constituted an act of both money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

172.   The $242,250.00 check written by Sandlin to pay off Renzi's separate personal debt was an illegal kickback for Renzi's extortion of Plaintiffs by insisting Plaintiffs purchase the Sandlin Property and include it in their proposed land exchange as a condition to Renzi agreeing to support the Aries Group's land exchange proposal.

173.   On or about December 8, 2005, Renzi paid his third quarter estimated taxes to the Internal Revenue Service through a $45,000.00 check written on his personal checking account at Bank One—the same account into which Renzi had transferred that very day $45,000,000.00 in illegal proceeds from the Rain Whisper Account.

174.   Renzi knew the funds upon which he was drawing to write the $45,000.00 check represented the proceeds of Renzi's and Sandlin's unlawful activity.

175.   The funds upon which Renzi drew to write the $45,000.00 check did in fact involve the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

176.   Renzi's conduct in engaging in the financial transaction by which he paid

31

COMPLAINT

his third quarter estimated taxes through a $45,000.00 check written on his personal checking account at Bank One constituted an act of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

177.    On or about January 10, 2006, Renzi transferred $324,287.05 from the Rain Whisper Account to a Patriot Insurance bank account at Bank One via an intra-bank transfer within Bank One.

178.    Renzi knew the funds he caused to be transferred from the Rain Whisper Account to the Patriot Insurance bank account represented the proceeds of Renzi's and Sandlin's unlawful activity.

179.    The funds Renzi caused to be transferred from the Rain Whisper Account to the Patriot Insurance bank account did in fact involve the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

180.    Renzi knew the financial transaction he was conducting when he transferred the funds from the Rain Whisper Account to the Patriot Insurance bank account was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

181.    Renzi's conduct in engaging in the financial transaction by which he caused the $324,287.05 to be transferred from the Rain Whisper Account to the Patriot Insurance bank account constituted an act of both money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

182.    On or about February 10, 2006, Renzi caused $325,000.00 to be transferred

COMPLAINT

from one Patriot Insurance bank account at Bank One to another Patriot Insurance bank account at Bank One via an intra-bank transfer within Bank One.

183.   Renzi knew the funds he caused to be transferred between the Patriot Insurance bank accounts represented the proceeds of Renzi's and Sandlin's unlawful activity.

184.   The transfer of $325,000.00 from one Patriot Insurance bank account to another did in fact involve the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

185.   Renzi knew the financial transaction he was conducting when he transferred the funds from one Patriot Insurance bank account to another was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

186.   Renzi's conduct in engaging in the financial transaction by which he transferred $325,000.00 between the two Patriot Insurance bank accounts constituted an act of both money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

187.   On or about February 10, 2006, Renzi caused the $325,000.00 he had just transferred from one Patriot Insurance bank account to another Patriot Insurance bank account to be further transferred from the latter Patriot Insurance bank account to Renzi's personal checking account at Bank One via an intra-bank transfer at Bank One, for Renzi's use in writing checks for the payment of unpaid federal and state income taxes owed by Renzi on his 2001 federal and state amended tax returns.

Smith | Campbell | Clifford | Kearney | Gore

188.   Renzi knew the funds he caused to be transferred from the Patriot Insurance bank account to his personal checking account represented the proceeds of Renzi's and Sandlin's unlawful activity.

189.   The transfer of $325,000.00 from the Patriot Insurance bank account to Renzi's personal checking account did in fact involve the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

190.   Renzi knew the financial transaction he was conducting when he transferred the funds from the Patriot Insurance bank account to Renzi's personal checking account was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity—namely, the acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

191.   Renzi's conduct in engaging in the financial transaction by which he transferred the $325,000.00 from the Patriot Insurance bank account to his personal checking account constituted an act of both money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a), for which both Renzi and Sandlin are culpable as principals within the meaning of 18 U.S.C. § 2.

192.   On or about May 31, 2006, Renzi filed a false Financial Disclosure Statement for Calendar Year 2005 with the House in which Renzi did not disclose, among other things, the $700,000.00 promissory note from Sandlin or the $733,000.00 in payments Renzi received from Sandlin as an illegal kickback for the sale of the Sandlin Property.

193.   Renzi never did sponsor or introduce Plaintiffs' proposed land exchange as he had promised to do.

///

Smith | Campbell | Clifford | Kearney | Gore

Smith | Campbell | Clifford | Kearney | Gore

**4.** **Renzi And Sandlin Conspired To Commit Money Laundering And Engage In Monetary Transactions In Criminally Derived Property, In Violation Of 18 U.S.C. § 1956(h).**

194.   Renzi and Sandlin conspired together and agreed to commit the acts of money laundering and engaging in monetary transactions in criminally derived property alleged herein, in violation of 18 U.S.C. § 1956(h).

195.   It was the object of the conspiracy for Renzi and Sandlin to distribute the proceeds of the financial transactions with Plaintiffs relating to the sale of the Sandlin Property without detection and in a manner designed to facilitate Renzi's and Sandlin's use of the proceeds in financial transactions to pay personal expenses and business debts.

196.   As alleged herein, in furtherance of their conspiracy to commit money laundering and engage in monetary transactions in criminally derived property, Sandlin paid the illegal kickback to Renzi alleged herein using the names of corporate entities, even though the $700,000.00 promissory note Sandlin executed in favor of Renzi was a debt owed by Sandlin personally to Renzi personally.

197.   As alleged herein, in furtherance of their conspiracy to commit money laundering and engage in monetary transactions in criminally derived property, Renzi and Sandlin used the services of escrow companies to distribute the proceeds of the extortionate sale of the Sandlin Property, making the transactions more difficult to trace for taxing authorities, investigators, and others.

198.   The Patriot Insurance letter dated August 30, 2005, that Renzi caused to be transmitted to Pioneer Title contained the false statements alleged herein regarding the supposed sale of Kingman property and the "calling" of a note to hide the source of the $533,000.00 that Sandlin paid to Patriot Insurance through a transaction conducted by Sandlin at Pioneer Title in Sierra Vista, Arizona, on or about September 30, 2005, and to thereby also hide the connection between Sandlin and Renzi, all in furtherance of Renzi's and Sandlin's conspiracy to commit money laundering and engage in monetary

transactions in criminally derived property.

199.    Renzi made false statements in the annual financial disclosure statements Renzi was required by law to file with the House of Representatives and in Renzi's 2005 personal tax return to further conceal the nature of his transactions with Sandlin.

**D.    Renzi Used A Portion Of The Income Derived From The Pattern Of Racketeering Activity In The Operation Of Patriot Insurance, In Violation Of 18 U.S.C. § 1962(a).**

200.    As alleged herein, Sandlin received $1,000,000.00 between May 3 and 5, 2005, as earnest money for the purchase of the Sandlin Property.

201.    The $1,000,000.00 received by Sandlin as earnest money for the purchase of the Sandlin Property constituted income derived, directly or indirectly, from a pattern of racketeering activity—namely, the multiple acts of extortion and honest services wire fraud committed by Renzi and Sandlin alleged herein.

202.    Renzi participated as a principal in the pattern of racketeering activity through extortion and honest services wire fraud alleged herein.

203.    As alleged herein, Sandlin drew from the $1,000,000.00 received as earnest money for the purchase of the Sandlin Property to write a $200,000.00 check payable to Renzi's company Renzi Vino on or about May 5, 2005.

204.    As alleged herein, Renzi deposited the $200,000.00 check written by Sandlin and payable to Renzi Vino into Patriot Insurance's trust account at Bank One on or about May 20, 2005.

205.    On or about June 1, 2005, Renzi used $164,590.68 of the $200,000.00 in funds deposited into Patriot Insurance's trust account to pay a Promissory Demand Note, which was entered into in January 2005 by Patriot Insurance and a creditor.

206.    In so doing, Renzi directly or indirectly used a portion of the proceeds of income derived, directly or indirectly, from a pattern of racketeering activity in which Renzi participated as a principal, within the meaning of 18 U.S.C. § 2, in the

Smith | Campbell | Clifford | Kearney | Gore

establishment or operation of an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, in violation of 18 U.S.C. § 1962(a).

## IV.   Renzi And Sandlin Were Indicted And Are Being Criminally Prosecuted For Their Illegal Conduct.

207.   After federal prosecutors and law enforcement agencies conducted an investigation of Renzi's and Sandlin's conduct, a federal grand jury returned an indictment on February 21, 2008, charging Renzi with one count of conspiracy to commit extortion and honest services wire and mail fraud, in violation of 18 U.S.C. §§ 371, 1341, 1343, 1346, and 1951(a); nine counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); one count of concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); thirteen counts of engaging in monetary transactions in criminally derived funds, in violation of 18 U.S.C. § 1957; two counts of extortion, in violation of 18 U.S.C. § 1951(a); one count of conspiracy to commit insurance fraud, in violation of 18 U.S.C. §§ 371 and 1033(a)(1) and (b)(1); and seven counts of insurance fraud, in violation of 18 U.S.C. § 1033(a)(1) and (b)(1), in connection with Renzi's and Sandlin's conduct alleged herein.

208.   The indictment also charged Sandlin with one count of conspiracy to commit extortion and honest services wire and mail fraud, in violation of 18 U.S.C. §§ 371, 1341, 1343, 1346, and 1951(a); nine counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); one count of concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); thirteen counts of engaging in monetary transactions in criminally derived funds, in violation of 18 U.S.C. § 1957; and two counts of extortion, in violation of 18 U.S.C. § 1951(a), in connection with Renzi's and Sandlin's conduct alleged herein.

Smith | Campbell | Clifford | Kearney | Gore

COMPLAINT

209.   A superseding indictment was returned on November 13, 2008, and on September 22, 2009, a second grand jury returned a second superseding indictment ("SSI") against Renzi, Sandlin, and two other defendants.

210.   The SSI charged Renzi with forty-eight counts of criminal charges, including one count of conspiracy to commit extortion and honest services wire and mail fraud, in violation of 18 U.S.C. §§ 371, 1341, 1343, 1346, and 1951(a); nine counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); one count of concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); thirteen counts of engaging in monetary transactions in criminally derived funds, in violation of 18 U.S.C. § 1957; two counts of extortion, in violation of 18 U.S.C. § 1951(a); two counts of conspiracy to commit insurance fraud, in violation of 18 U.S.C. §§ 371 and 1033(a)(1) and (b)(1); seventeen counts of insurance fraud, in violation of 18 U.S.C. § 1033(a)(1) and (b)(1); one count of racketeering, in violation of 18 U.S.C. § 1962(c); and one count of making false statements return, in violation of 26 U.S.C. § 7206(1), in connection with Renzi's and Sandlin's conduct alleged herein.

211.   The SSI charged Sandlin with the same twenty-seven counts of criminal charges as the original indictment and added a charge for making a campaign contribution in the name of another, in violation of 2 U.S.C. §§ 441f and 437g(d)(1)(A)(ii).

212.   Renzi and Sandlin are currently awaiting trial on the crimes charged against them in the SSI.

213.   The parallel criminal proceedings against Renzi and Sandlin for the wrongful and unlawful conduct alleged herein suspended the running of the statute of limitations with respect to Plaintiffs' private right of action under 18 U.S.C. § 1964(c).

214.   Plaintiffs demand trial by jury.

///

Smith | Campbell | Clifford | Kearney | Gore

## CLAIMS FOR RELIEF

### COUNT ONE
### (Federal RICO, 18 U.S.C. §§ 1962(a) and 1964(c))

215.    Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

216.    As alleged herein, Patriot Insurance is an enterprise, within the meaning of 18 U.S.C. § 1961(4), which is engaged in, or the activities of which affect, interstate or foreign commerce.

217.    As alleged herein, Renzi and Sandlin engaged in a pattern of racketeering activity, in that Renzi and Sandlin committed at least two predicate acts of racketeering activity within ten years of each other and that each predicate act was connected with the other by some common scheme, plan, or motive so as to constitute a pattern.

218.    The predicate acts of racketeering activity committed by Renzi and Sandlin include (1) the various acts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, alleged herein; (2) the various acts of extortion, in violation of 18 U.S.C. §1951(a), alleged herein; (3) the various acts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii) and (h), alleged herein; and (4) the various acts of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 18 U.S.C. § 1957(a), alleged herein.

219.    As alleged herein, these predicate acts of racketeering activity occurred over a substantial period of time and amounted to, or otherwise constituted a threat of, continued racketeering activity.

220.    As alleged herein, Renzi participated in these predicate acts of racketeering as a "principal" within the meaning of 18 U.S.C. § 2, in that Renzi knowingly and willfully committed the predicate acts of racketeering, or knowingly and willfully aided and abetted Sandlin in the commission of the predicate acts of racketeering.

221.    As alleged herein, Renzi received income derived, directly or indirectly,

Smith | Campbell | Clifford | Kearney | Gore

from the pattern of racketeering activity.

222.    As alleged herein, Renzi used or invested, directly or indirectly, a part of such income, or the proceeds of such income, in the establishment or operation of Patriot Insurance, in violation of 18 U.S.C. § 1962(a).

223.    As alleged herein, as a direct and proximate result of Renzi's and Sandlin's commission of the foregoing predicate acts of racketeering and the pattern of racketeering activity, Plaintiffs have been injured in their business or property.

WHEREFORE, Plaintiffs pray for judgment against Renzi as follows:

A.      For Plaintiffs' actual and consequential damages, trebled pursuant to 18 U.S.C. § 1964(c);

B.      For Plaintiffs' costs and attorneys' fees, pursuant to 18 U.S.C. § 1964(c); and

C.      For all other relief justified under the circumstances.

## COUNT TWO
### (Federal RICO, 18 U.S.C. §§ 1962(c) and 1964(c))

224.    Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

225.    As alleged herein, the Renzi & Sandlin Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961(4), in that it is a group of individuals associated in fact although not a legal entity.

226.    As alleged herein, Renzi and Sandlin were associated with the Renzi & Sandlin Enterprise.

227.    As alleged herein, Renzi and Sandlin participated in the operation and management of the Renzi & Sandlin Enterprise in such a way, directly or indirectly, to have played some part in directing the affairs of the enterprise.

228.    As alleged herein, the Renzi & Sandlin Enterprise engaged in, or had some effect upon, interstate or foreign commerce.

229.    As alleged herein, Renzi and Sandlin knowingly and willfully conducted or participated, directly or indirectly, in the conduct of the Renzi & Sandlin Enterprise's affairs through a pattern of racketeering activity.

230.    As alleged herein, Renzi and Sandlin engaged in a pattern of racketeering activity, in that Renzi and Sandlin committed at least two predicate acts of racketeering activity within ten years of each other and that each predicate act was connected with the other by some common scheme, plan, or motive so as to constitute a pattern.

231.    The predicate acts of racketeering activity committed by Renzi and Sandlin include (1) the various acts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, alleged herein; (2) the various acts of extortion, in violation of 18 U.S.C. §1951(a), alleged herein; (3) the various acts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii) and (h), alleged herein; and (4) the various acts of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 18 U.S.C. § 1957(a), alleged herein.

232.    As alleged herein, these predicate acts of racketeering activity occurred over a substantial period of time and amounted to, or otherwise constituted a threat of, continued racketeering activity.

233.    As alleged herein, Renzi's and Sandlin's association with the Renzi & Sandlin Enterprise facilitated their commission of the predicate acts of racketeering activity.

234.    As alleged herein, Renzi's and Sandlin's commission of the predicate acts of racketeering activity has some direct or indirect effect on the Renzi & Sandlin Enterprise.

235.    As alleged herein, as a direct and proximate result of Renzi's and Sandlin's commission of the foregoing predicate acts of racketeering and the Renzi & Sandlin Enterprise's pattern of racketeering activity, Plaintiffs have been injured in their business or property.

Smith | Campbell | Clifford | Kearney | Gore

WHEREFORE, Plaintiffs pray for judgment against Renzi and Sandlin, jointly and severally, as follows:

A.      For Plaintiffs' actual and consequential damages, trebled pursuant to 18 U.S.C. § 1964(c);

B.      For Plaintiffs' costs and attorneys' fees, pursuant to 18 U.S.C. § 1964(c); and

C.      For all other relief justified under the circumstances.

**COUNT THREE**
**(Federal RICO, 18 U.S.C. §§ 1962(d) and 1964(c))**

236.    Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

237.    As alleged herein, Renzi and Sandlin conspired and knowingly agreed to join together to violate 18 U.S.C. § 1962(a) and (c) by facilitating a scheme that included (1) the operation or management of an association-in-fact enterprise engaged in a pattern of extortion, honest services wire fraud, money laundering, and monetary transactions in criminally derived property; and (2) the use or investment of income or the proceeds of income derived, directly or indirectly, from a pattern of extortion, honest services wire fraud, money laundering, and monetary transactions in criminally derived property in the establishment or operation of Patriot Insurance.

238.    As alleged herein, both Renzi and Sandlin committed overt acts during the existence of the conspiracy in an effort to accomplish the objects and purposes of the conspiracy.

239.    As alleged herein, both Renzi and Sandlin knowingly and willfully agreed to personally commit, or aid and abet the other's commission of, the following predicate acts of racketeering activity: (1) the various acts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, alleged herein; (2) the various acts of extortion, in violation of 18 U.S.C. §1951(a), alleged herein; (3) the various acts of money laundering, in

Smith | Campbell | Clifford | Kearney | Gore

1  violation of 18 U.S.C. § 1956(a)(1)(B)(ii) and (h), alleged herein; and (4) the various acts

2  of engaging in monetary transactions in criminally derived property, in violation of 18

3  U.S.C. § 18 U.S.C. § 1957(a), alleged herein.

4      240.    As alleged herein, as a direct and proximate result of Renzi's and Sandlin's

5  conspiracy to violate 18 U.S.C. § 1962(a) and (c) and commit the foregoing predicate acts

6  of racketeering and pattern of racketeering activity, Plaintiffs have been injured in their

7  business or property.

8      WHEREFORE, Plaintiffs pray for judgment against Renzi and Sandlin, jointly and

9  severally, as follows:

10     A.      For Plaintiffs' actual and consequential damages, trebled pursuant to 18

11  U.S.C. § 1964(c);

12     B.      For Plaintiffs' costs and attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

13  and

14     C.      For all other relief justified under the circumstances.

15  Dated: July 12, 2012              SMITH CAMPBELL CLIFFORD KEARNEY GORE
                                      A Professional Law Corporation
16

17                                    By: /s/ Richard R. Thomas
                                          RICHARD R. THOMAS
18                                        STEPHEN C. BIGGS
                                      *Attorneys for Plaintiffs*

19

20

21

22

23

24

25

26